# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00605-CV

**Kenneth G. Martin and Karken Corporation, Appellants**

**v.**

**Barry Beitler; BAB 8, L.L.C.; Living Architecture and Construction Management, Inc.; and Marley Porter, Appellees**

## FROM THE DISTRICT COURT OF BURNET COUNTY, 33RD JUDICIAL DISTRICT NO. 34,655, HONORABLE PAUL R. DAVIS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Kenneth G. Martin and Karken Corporation appeal from the trial court's judgment rendered on a jury verdict in a case involving a commercial dispute. The jury found against Martin and Karken, except as to Martin's quantum meruit claim, and in favor of Barry Beitler; Beitler's company, BAB 8, L.L.C.; Marley Porter; and Porter's company, Living Architecture and Construction Management, Inc. (LACM), on their counterclaims. On appeal, Martin and Karken challenge the sufficiency of the evidence supporting the jury's negative findings on their claims and its affirmative findings on Beitler's and Porter's counterclaims and corresponding damage awards. They also allege errors in the court's charge and its decision to exclude certain evidence. In the alternative, they seek judgment to reflect the jury's award of quantum meruit damages, which the trial court omitted from the judgment. For the reasons that follow, we affirm in part and reverse and render in part.

## FACTUAL AND PROCEDURAL BACKGROUND

In late 2006 or early 2007, Daniel J. Robbins approached Martin, a long time resident of Horseshoe Bay, seeking to engage Martin as a preconstruction consultant and his company, Karken, as general contractor on a retail development project in Horseshoe Bay. Martin eventually agreed on the condition that Porter be the architect on the project. Robbins agreed, and Martin began work on the project. He subsequently became concerned that he had no written agreement with Robbins and Beitler, whom Martin contends Robbins held out as his partner in the project. Martin sent Robbins a proposed "Letter of Professional Engagement" (the Letter Agreement) between Robbins's company—The D.J. Robbins Company (Robbins Company)—Martin, and Karken. The Letter Agreement provided that the parties agreed to enter into a more formal contract that incorporated an American Institute of Architects (AIA) standard form contract structured to pay Karken on a "cost plus 15% basis with a Guaranteed Not-to-Exceed Maximum Price" and Martin "5% of the Maximum Price out of the first bank draw." The Letter Agreement listed the duties Martin was to perform and included a provision for Robbins Company to pay Martin $10,000 upon execution of the agreement. After some delay, in late August 2007, Robbins faxed Martin the Letter Agreement, signed by Robbins on behalf of Robbins Company and by Beitler, with one change—payment to Martin was to be "on hard costs only." The Letter Agreement did not define the "Maximum Price" or "hard costs." Within a week, Robbins gave Martin a check for $10,000.

Martin continued working on the project, performing such duties as seeking approval of the property owners' association, obtaining subcontractors, seeking tenants, and working with Horseshoe Bay city officials and community leaders. At Porter's suggestion, he also met with MST

Constructors about serving as prime subcontractor. In mid-October 2007, Porter began discussions with MST about acting as general contractor "through a specific scope of work." MST offered to perform the work for cost plus 7.5%. Martin called Porter, concerned that Porter was interfering with his contract. After Porter assured him there was no need for concern and both Porter and MST told Martin that MST would participate only if Martin was still involved in the project, Martin continued his work.

In November 2007, the project was introduced to the Horseshoe Bay community through a newspaper article, town hall meeting, and city council meeting. Only a conceptual plan was presented, and the evidence is conflicting on whether and to what extent further redesign would have been necessary to obtain subsequent city approval. No AIA contract had been negotiated or executed, and Martin continued to be concerned that Robbins and Beitler did not intend to honor the Letter Agreement. The day after the council meeting, Martin sent Robbins a proposed "Receipt and Release," whereby he would withdraw from the project provided he was paid for work performed. Robbins never responded but informed Martin that his and Karken's fees needed to be reduced. Martin refused and stopped work, and Porter offered to step into Martin's role for a lower fee. A series of contentious emails followed that form the basis of Porter's and Beitler's counterclaims. Martin accused them of undermining him, engaged in name calling, and accused Porter of certain dishonest practices concerning his fees. Martin copied the emails to various community and city leaders. Porter, Robbins, and Beitler began to redesign the project, but there is nothing in the record to indicate they ever presented another plan to the city for approval.

3

Martin and Karken sued Beitler, Robbins, and Robbins's Company for breach and repudiation of contract;[1] Porter for tortious interference with contract; and Robbins, Porter, and LACM for impossibility of performance of contract.[2] In the alternative, they sought quantum meruit damages. Porter filed a counterclaim for defamation, and Porter and Beitler filed counterclaims for tortious interference with prospective business relationships. Following a week-long trial, the jury found against Martin and Karken on all but Martin's quantum meruit claim, for which it awarded him $74,600, and in favor of Beitler and Porter on their counterclaims, for which it awarded damages totaling $575,000. The trial court rendered judgment on the verdict but omitted the quantum meruit damage award to Martin. Martin and Karken filed a motion for judgment notwithstanding the verdict, motion to modify judgment, and alternatively, motion for new trial. The motion was overruled by operation of law. This appeal followed.

**DISCUSSION**

**Porter's Defamation Counterclaim**

In issue one, Martin and Karken challenge the legal sufficiency of the evidence supporting the jury's findings on Porter's counterclaim for defamation and damage awards. When

---

[1] Martin's and Karken's claims against Robbins Company were severed prior to trial. Robbins did not participate in the trial, and Martin's and Karken's claims against him were severed post-judgment. Although the actions of Robbins and Robbins Company are relevant to the factual background and issues in this case, they are not parties to this appeal.

[2] Although Martin and Karken named BAB 8 as a defendant, they asserted no allegations against it. The trial court submitted no issues as to BAB 8 and rendered a take-nothing judgment against Martin and Karken on their claims against it, which Martin and Karken do not appeal. Although LACM did not assert a counterclaim, the trial court submitted the liability and damages issues on tortious interference as to Porter "and/or" LACM. Martin and Karken refer only to Porter in their briefing of that issue.

the appellant challenges the legal sufficiency of the evidence supporting an adverse finding on which he did not have the burden of proof at trial, he must demonstrate that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Texas Dep't of Pub. Safety v. Alexander*, 300 S.W.3d 62, 72 (Tex. App.—Austin 2009, pet. denied). We review the evidence in the light most favorable to the verdict, crediting favorable evidence if a reasonable fact finder could, and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). "Our traditional legal sufficiency—or 'no evidence'—standard of review upholds a finding supported by '[a]nything more than a scintilla of evidence.'" *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014) (quoting *Formosa Plastics Corp. U.S.A. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998)). More than a scintilla exists when the evidence would enable reasonable and fair-minded people to reach different conclusions. *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014). "However, if the evidence is so weak that it only creates a mere surmise or suspicion of its existence, it is regarded as no evidence." *Waste Mgmt. of Tex., Inc. v. Texas Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex. 2014).

The jury found that certain email statements concerning Porter made by Martin to Horseshoe Bay city and community leaders were defamatory and awarded Porter $50,000 for past injury to reputation and $200,000 for past mental anguish. Martin and Karken contend that the statements were neither defamatory per se nor defamatory per quod as a matter of law and that there was no evidence to support the jury's damage award. Assuming without deciding that the statements were defamatory, we conclude that there is no evidence to support the award of damages.

5

Question 31 instructed the jury that if they found that Martin had published certain statements concerning Porter, that the statements were defamatory and false, and that Martin knew or should had known in the exercise of ordinary care that they were false, then they were to determine "[w]hat sum of money, if any, if paid now in cash, would fairly and reasonably compensate Marley Porter for his injuries, if any, proximately caused by Kenneth G. Martin's defamatory statements." Question 3 further instructed the jury that if the statements were "deemed to be defamatory per se," [they] must award at least nominal damages for injury to reputation in the past." Question 3 then asked the jury to determine damages for past and future injury to reputation and past and future mental anguish. Martin and Karken did not object to the submission of question 31. When a party fails to object, "it is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence." *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Accordingly, we will evaluate the award of damages based on question 31.

"Texas law presumes that defamatory per se statements cause reputational harm and entitle a plaintiff to general damages such as loss of reputation and mental anguish." *Burbage*, 447 S.W.3d at 259. However, this presumption yields only nominal damages, which the Supreme Court has defined as a "trifling sum," such as $1–100, and which are awarded when there is no proof of serious harm. *Id.*; *Hancock v. Variyam*, 400 S.W.3d 59, 65 (Tex. 2013); *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 665 (Tex. 2009). "Beyond nominal damages, we review presumed damages for evidentiary support[, including] whether any evidence supports the *amount* of jury damages." *Burbage*, 447 S.W.3d at 259 (citing *Hancock*, 400 S.W.3d at 66; *Bentley v. Bunton*, 94 S.W.3d 561, 606 (Tex. 2002)). Because the jury awarded substantial damages,

6

whether we assume for the sake of argument that the statements were defamatory per se or defamatory per quod, there must be legally sufficient evidence to support both the jury's findings of damage for reputational injury and mental anguish and the amount of the jury's compensatory damage awards. *Id.*; *Waste Mgmt.*, 434 S.W.3d at 160 (evidence must be legally sufficient as to both existence and amount of non-economic damages such as damages for loss of reputation); *see Hancock*, 400 S.W.3d at 68 ("Having concluded that Hancock's statements were not defamatory *per se*, we need not decide whether the statements were defamatory because—even if they were as a matter of law—there is no evidence of actual damages.").

The jury awarded Porter $50,000 in damages for past injury to reputation. However, we agree with Martin and Karken that the record contains no evidence that Porter's reputation was actually damaged. When asked if the emails made him feel that his reputation was being attacked, Porter responded that he felt like his "soul was being attacked." When asked if he felt the emails were an attack on his personal and professional credibility, he responded that he thought "it was screaming from a very sad friend." Although Porter testified that he "believe[d]" the comments damaged his reputation in Horseshoe Bay, he did not show any actual loss of reputation or provide any evidence that any of the recipients of the email statements actually believed them. Concerning the one recipient Porter mentioned in his testimony, Porter stated only that he did not know if the statements led the recipient to refuse to refer business to him and added that Porter's business did not "parallel" that of the recipient. Porter also testified that he could not estimate the number of jobs he did not receive and there was no way to calculate the potential loss of business from the emails.

7

Although it is impossible to calculate the exact amount of injury to reputation, which requires that the jury be given a measure of discretion in finding damages, there must be some evidence to justify the amount awarded. *Bentley*, 94 S.W.3d at 606. A "'private defamation plaintiff . . . may recover only such damages as are sufficient to compensate him for actual injury.'" *Burbage*, 447 S.W.3d at 259 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974)). The jury was charged with finding an amount that would "fairly and reasonably compensate" Porter, not to "pick a number and put it in the blank." *Bentley*, 94 S.W.3d at 606.

Here, there was no evidence of injury to reputation, *see Burbage*, 447 S.W.3d at 262–63 (evidence of community awareness of defamatory statements and testimony that effect on reputation was unknown was no evidence that anyone believed statements and no evidence of actual loss of reputation); *Hancock*, 400 S.W.3d at 71 (noting that "loss of reputation for defamation is concerned with recipient believing statement," and holding that where plaintiff offered no evidence that recipient of allegedly defamatory letter believed defendant's statements, plaintiff offered no evidence of injury to reputation), and no evidence to justify the amount of damages the jury awarded for loss of reputation, *see Burbage*, 447 S.W.3d at 261 (citing "ballpark estimate" of business's value and speculative evidence of actual loss of value in concluding there was no evidence to support damage award); *Waste Mgmt.*, 434 S.W.3d at 160–61 (corporate executive's estimate of value of company's reputation and exhibits showing lost profits—which are not sort of general damages that necessarily flow from defamatory publication—and showing decline in business in area affected by publication relative to overall business constituted no evidence of actual damages for injury to reputation). In the absence of any evidence that anyone believed the email statements or that they

caused actual injury to Porter's reputation in any amount, we conclude that the evidence is legally insufficient to support the jury's award of $50,000 damages for injury to Porter's reputation.

The jury also awarded Porter $200,000 damages for past mental anguish. As with injury to reputation, beyond nominal damages, there must be evidence of both the existence of compensable mental anguish and evidence to justify the amount awarded. *Burbage*, 447 S.W.3d at 259; *Hancock*, 400 S.W.3d at 68 (citing *Bentley*, 94 S.W.3d at 606). Mental anguish is "'only compensable if it causes a 'substantial disruption in . . . daily routine' or 'a high degree of mental pain and distress.'" *Hancock*, 400 S.W.3d at 68 (quoting *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995)). "Even when an occurrence is of the type for which mental anguish damages are recoverable, evidence of the nature, duration, and severity of the mental anguish is required." *Id.* (citing *Service Corp. Int'l v. Guerra*, 348 S.W.3d 221, 231 (Tex. 2011)). Mental anguish damages must constitute compensation for actual injuries and not a "disguised disapproval of the defendant." *Bentley*, 94 S.W.3d at 605.

The Supreme Court has held that evidence a person experienced insomnia, frustration, and agony is not legally sufficient to support an award for mental anguish, *see Guerra*, 348 S.W.3d at 232, and that evidence the plaintiff was embarrassed, distracted at home and at work, and stressed did not reflect substantial disruption in daily routine or a high degree of mental pain and distress so as to support an award for mental anguish, *see Hancock*, 400 S.W.3d at 69–70. On the other hand, evidence that a plaintiff sought medical treatment for anxiety and depression and experienced headaches, stomach problems, and sleeplessness has been held to be some evidence of mental anguish. *See Guerra*, 348 S.W.3d at 233. And evidence that a judge accused of corruption

9

experienced embarrassment in the community where he spent almost all of his life, was distressed, lost sleep, and according to his friends' testimony, was depressed, suffered a major change in demeanor, and would never be the same, along with evidence that his children were distressed and that everywhere he went people would say they had heard he had been called corrupt has been held evidence of mental anguish. *See Bentley*, 94 S.W.3d at 576, 606–07.

Porter did not offer any evidence that he suffered mental anguish. He did not testify that he had suffered any physical pain or stress or any disruption. He stated only that in response to the email statements, he felt, "attacked," "hurt," "shocked," "sadness," and "despair" and that when he read Martin's accusation of tortious interference, his "heart started racing," he thought "[Martin's] going to sue us," and felt "threatened" but "optimistic it would never come to that." This testimony does not reflect a substantial disruption in daily routine or a high degree of mental pain and distress. *See Hancock*, 400 S.W.3d at 70 (citing *Guerra*, 348 S.W.3d at 232). Porter did not require medical attention, claim to suffer any disruption in his home or professional life, "elaborate on the impact of anxiety or depression on his life," or offer any witness to "corroborate an outward manifestation of the mental anguish [he] allegedly experienced." *See id.* (citing *Guerra*, 348 S.W.3d at 232–33, *Bentley*, 94 S.W.3d at 606–07). We conclude that there is no evidence of the existence of compensable mental anguish and that the evidence is therefore legally insufficient to support the jury's compensatory damage award to Porter for mental anguish. *See id.* at 68, 70. We sustain Martin's and Karken's first issue.[3]

---

[3] Because Martin's and Karken's legal sufficiency argument is dispositive of this issue, we do not reach their alternative factual sufficiency argument.

**Tortious Interference with Prospective Business Relations**

In their second issue, Martin and Karken challenge the legal sufficiency of the evidence supporting the jury's findings on Porter's and Beitler's counterclaims for tortious interference with business relations and corresponding damage awards. These counterclaims were based on Martin's allegedly defamatory statements. The jury found that Martin intentionally interfered with Porter's and/or LACM's potential business relationships and awarded $150,000 in damages. The jury further found that Martin intentionally interfered with other business relationships that would be necessary for Beitler to develop the project and awarded $174,699.50 for costs to redesign the project. Assuming without deciding that Martin's emails were defamatory and that there was evidence to support a finding of tortious interference, we conclude that the evidence was legally insufficient to support the jury's damage awards to Porter and Beitler.

The jury awarded Porter $150,000 in past lost profits. The rule concerning adequate evidence of lost profit damages is well established:

> Recovery for lost profits does not require that the loss be susceptible of exact calculation. However, the injured party must do more than show that they suffered some lost profits. The amount of the loss must be shown by competent evidence with reasonable certainty. What constitutes reasonably certain evidence of lost profits is a fact intensive determination. As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. Although supporting documentation may affect the weight of the evidence, it is not necessary to produce in court the documents supporting the opinions or estimates.

*ERI Consulting Engr's, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010) (quoting *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992)). In *ERI Consulting*, the Supreme Court held

11

that testimony by a co-owner of the company concerning its profit margin and detailed invoices showing a substantial drop in revenue over the relevant period constituted legally adequate evidence. *Id.* at 876–77. In *Holt Atherton*, the plaintiff testified that he had suffered $200,200 in lost income. 835 S.W.2d at 84. The Supreme Court concluded that testimony was legally insufficient because it did not provide any indication of how the plaintiff had determined what his lost profits were. *Id.* The Supreme Court also held that the bare assertion that contracts were lost—absent specification of which contracts were lost, how many were lost, how much profit would have come from the lost contracts, and who would have awarded the contracts—did not demonstrate a reasonably certain objective determination of lost profits. *Id.* at 85 ("Recovery of lost profits must be predicated on one complete calculation.").

Here, Porter offered no evidence that he lost any profits. He did not identify any lost contracts and stated only that Martin's email comments "did affect business for awhile, but it's come back." He did not testify concerning his profit margin or loss of revenue at all, much less testify to any specific amount or offer any documentary proof. Nor did he offer any facts, figures, or data on which the jury could calculate any award of lost profits. When asked about providing some calculable number of jobs or money lost as a result of Martin's emails, he stated only that "it's impossible" to estimate the number of jobs that he simply did not receive. We conclude that the evidence does not provide a reasonable basis for determining Porter's lost profits and is therefore legally insufficient to support the jury's damage award. *See ERI Consulting*, 318 S.W.3d at 876; *Holt Atherton*, 835 S.W.2d at 84–86.

12

The jury awarded Beitler $174,699.50 as reasonable and necessary expenses to redesign the project. Beitler offered evidence that Martin's plans for the project, in particular its overall size and the dimensions of the parking spaces, did not meet city requirements and necessitated redesign. We conclude that there is no evidence to support the jury's damage award to Beitler. In support of his damage claim, Beitler relied on an exhibit listing fees paid to Porter for project design. The exhibit covered a period of time both before and after Martin ceased work on the project and reflects fees of $349,339. However, the exhibit does not indicate what portion of the fees was attributable to redesign, and the only testimony on this issue was Beitler's affirmative answer to his attorney's question that "part of that $349,339 . . . would be attributable to [redesign]." Although Beitler's attorney in closing argument offered the figure of $174,699.50—which the jury apparently adopted—counsel's argument is not evidence. *Elkins v. Stotts-Brown*, 103 S.W.3d 664, 669 (Tex. App.—Dallas 2003, no pet.). Accordingly, we conclude that the evidence was legally insufficient to support the jury's award of damages in that amount. We sustain Martin's and Karken's second issue.[4]

**Jury Charge**

In their third issue, Martin and Karken complain that the trial court committed harmful error in its jury charge as to their claims. Specifically, they contend that the trial court erred in improperly conditioning the breach of contract questions on questions concerning the parties' intent to be bound by the Letter Agreement and in refusing to submit their fraud claims. However,

---

[4] As with their first issue, because Martin's and Karken's legal sufficiency argument is dispositive of this issue, we do not reach their alternative factual sufficiency argument.

13

the record reflects that Martin and Karken failed to object to the charge on these grounds prior to submission to the jury and have therefore waived these complaints on appeal. *See Burbage*, 447 S.W.3d at 256 (discussing preservation of jury charge error). Rule 272 requires that objections be presented to the court before the charge is read to the jury. *See* Tex. R. Civ. P. 272. In addition, Rule 279 provides that on appeal, "all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived." *See* Tex. R. Civ. P. 279.

Martin and Karken contend that the trial court was on notice from the pleadings and arguments that one of their theories of recovery was fraud and "refused to submit a fraud question." Similarly, they argue that the trial court was aware that they had asserted in summary judgment briefing that the issue of whether there was a binding contract should be decided by the court, thus preserving their complaint that the trial court improperly submitted their contract claims. However, although Martin and Karken pleaded a cause of action for fraud, the reporter's record contains no reference to fraud during trial other than in the opening statement of Martin and Karken's counsel, which, as we have already observed, does not constitute evidence to support a jury question. *See Elkins*, 103 S.W.3d at 669. Further, the record reflects that while Martin and Karken objected to certain jury questions at the charge conference, they did not challenge the breach or repudiation of contract questions or request that their fraud claims be submitted to the jury or object to their omission from the charge before the charge was read to the jury. On this record, we cannot say that the trial court had the opportunity to remedy the alleged charge errors. Consequently, Martin and Karken have waived these complaints on appeal. *See* Tex. R. Civ. P. 272, 274, 279; Tex. R. App.

14

P. 33.1; *Burbage*, 447 S.W.3d at 256; *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 831 (Tex. 2012) (holding party could complain on appeal only if it made trial court aware, timely and plainly, of purported problem and obtained a ruling).  We overrule Martin and Karken's third issue.

**Exclusion of Evidence**

In their fourth issue, Martin and Karken argue that the trial court committed harmful error in excluding from evidence a letter they contend Beitler sent to Fred Barrington, the owner of the land Beitler ultimately purchased to build the project.  We review a trial court's decision to admit or exclude evidence for an abuse of discretion.  *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005) (per curiam).  A trial court abuses its discretion when it acts without regard to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241– 42 (Tex. 1985).  We must uphold a trial court's evidentiary ruling if there is any legitimate basis in the record to support it. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

The letter, written on the letterhead of one of Beitler's companies, stated that Beitler and Robbins were partners.  Although the letter was purportedly written and signed by Beitler, the "signature" was typed, not handwritten.  Martin offered the letter, and the trial court conducted an evidentiary hearing.  Martin testified that he received it from Barrington and that it was produced from Karken's business records.  Beitler testified that he saw the letter for the first time at his deposition, did not write it, and did not authorize anyone to write it and that Robbins was never his partner on this project.  He also testified that everyone in his building had access to his copy room where his letterhead was kept and that he presumed Robbins had written the letter and "signed" his name.

Texas Rule of Evidence 901(a) establishes the authentication requirements for the admissibility of evidence. "[A]uthentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Tex. R. Evid. 901(a). This requirement can be satisfied by testimony of a witness with knowledge that the matter is what it is claimed to be. Tex. R. Evid. 901(b)(1); *Good v. Baker*, 339 S.W.3d 260, 273 (Tex. App.—Texarkana 2011, pet. denied). Beitler offered uncontroverted testimony that he did not write or authorize the letter. He also testified that he did not sign it, and the letter on its face contained only a typed "signature." Martin testified that he received the letter from Barrington. He did not claim to have received the letter directly from Beitler or have seen Beitler write it, and he testified that he did not ever discuss it with Beitler. Thus, Martin had no firsthand knowledge that the letter was what he claimed it to be.

Finally, although Martin testified the letter was a Karken business record, he also testified that he "never realized it was a forgery until later," essentially admitting that Beitler did not author the letter. "Simply put, [Martin] failed to sufficiently link the exhibit[] to [its] purported author." *See* Tex. R. Evid. 901(a)*; Martinez v. AA Foundries, Inc.*, No. 04-11-00879-CV, 2013 Tex. App. LEXIS 789, at *14. (Tex. App.—San Antonio Jan. 30, 2013, no pet.) (mem. op.) (citing *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012) (fact that email on its face purports to come from certain person's email address, without more, is typically insufficient to support finding of authenticity)). Faced with this evidence, we cannot conclude that the trial court abused its discretion in excluding the letter. *See In re J.P.B.*, 180 S.W.3d at 575; *Martinez*, 2013 Tex. App. LEXIS 789, at *14. We overrule Martin and Karken's fourth issue.

16

**Martin's and Karken's Claims**

In their fifth issue, Martin and Karken first argue that the findings on their contract claims are against the great weight and preponderance of the evidence. Although Martin and Karken challenge the factual sufficiency of the evidence supporting the jury's negative findings on their claims, their arguments are premised on their contention that the Letter Agreement contained all essential terms and was a binding contract. Beitler contends the Letter Agreement was merely an "agreement to agree" that was missing essential terms, including definitions of "hard costs" and "Maximum Price," terms which would have been agreed to in the AIA contract that was never negotiated or executed. Whether an agreement has all the essential terms to be legally enforceable is a question of law for the court, and whether a term is essential is determined on a case-by-case basis. *T. O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992); *America's Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 625 (Tex. App.—San Antonio 1996, writ denied). We agree with Beitler's construction of the Letter Agreement as merely an agreement to agree.

Generally, a contract is legally binding only if its terms are sufficiently definite to enable a court to understand the parties' obligations. *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000). If an alleged agreement is so indefinite as to make it impossible for a court to fix the legal obligations and liabilities of the parties, it cannot constitute an enforceable contract. *University Nat'l Bank v. Ernst & Whinney*, 773 S.W.2d 707, 710 (Tex. App.—San Antonio 1989, no writ). A lack of definiteness in an agreement may concern various elements, including time of performance, price to be paid, work to be done, or service to be rendered.

17

*Gannon v. Baker*, 830 S.W.2d 706, 709 (Tex. App.—Houston [1st Dist.] 1992, writ denied); *Terrell v. Nelson Puett Mortg. Co.*, 511 S.W.2d 366, 369 (Tex. Civ. App.—Austin 1974, writ ref'd n.r.e.). Although the parties may leave some terms for future negotiation, the essential terms of the contract must be agreed on before a court can enforce it. *T. O. Stanley Boot Co.*, 847 S.W.2d at 221; *Cleveland Reg'l Med. Ctr., L.P. v. Celtic Props., L.C.*, 323 S.W.3d 322, 334 (Tex. App.—Beaumont 2010, pet. denied). "[A]n agreement to make a future contract is enforceable only if it is 'specific as to all essential terms, and no terms of the proposed agreement may be left to future negotiations.'" *Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 846 (quoting *Foster v. Wagner*, 343 S.W.2d 914, 920–21 (Tex. Civ. App.—El Paso 1961, writ ref'd n.r.e.)). It is well settled that when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and constitutes merely an agreement to agree. *Id.*; *see Oakrock Exploration Co. v. Killam*, 87 S.W.3d 685, 690 (Tex. App.—San Antonio 2002, pet. denied).

We conclude that the Letter Agreement lacks essential terms. Although it specifies percentages for Martin's and Karken's fees, it does not specify what constitutes "hard costs," on which Martin's percentage was to be based, or state the "Maximum Price," by which both percentages were limited. Instead, these terms were left open for future negotiation, and the Letter Agreement expressly provides that the parties would enter into a formal AIA form contract —which the evidence shows would have contained these essential and numerous other to-be-negotiated terms, but which was never executed. It is inescapable, then, that the fee payments would be determined by a formula based on numbers yet to be arrived at and agreement that never occurred. Consequently, we conclude that because the Letter Agreement does not sufficiently fix the terms to

18

enable a court to determine what the parties agreed Martin and Karken were to be paid for their consulting and construction services and because it left essential terms for future negotiation, it fails for indefiniteness and is an unenforceable agreement to agree as a matter of law.[5] *See Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 847 (where letter agreement for future contract did not include amount or percentage of telephone company's payment to city to be apportioned to school district, it lacked essential term and was unenforceable); *Fiduciary Fin. Servs. of the Sw., Inc. v. Corilant Fin., LLC*, 376 S.W.3d 253, 258 (Tex. App.—Dallas 2012, pet. denied) (letter of intent that expressly stated definitive agreement would be drafted to memorialize terms and conditions of agreement between parties and left material terms for future adjustment and negotiation failed for indefiniteness and was not enforceable as matter of law); *Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 457–58 (Tex. App.—Fort Worth 2009, pet. denied) (where parties agreed to term "fair market value" but left agreement as to how market value was to be determined for future

---

[5] Martin and Karken rely on *David J. Sacks, P.C. v. Haden* in arguing that the absence of a fixed total price for services does not indicate a failure of the parties to reach a meeting of the minds with regard to essential terms. *See* 266 S.W.3d 447, 450 (Tex. 2008) (per curiam). In *Sacks*, which involved an attorney-client fee agreement, the parties agreed to an hourly rate but did not specify an exact total price to be paid or set a cap on fees. *Id.* at 448. After performing legal work for Haden, Sacks sought to recover the fees incurred. Citing the rule that when parties who have done everything else necessary to make a binding agreement fail to specify price, courts presume a reasonable price was intended, the Supreme Court concluded that the specified hourly rates made the agreement explicit as to the manner to be used in determining the price and confirmed that the charges would be reasonable. Here, the parties had not "done everything else necessary" besides state a total payment amount to make a binding agreement; they agreed to a minimal number of terms and expressly agreed to enter into a detailed AIA contract that would have defined essential terms necessary to determine the price. Further, the evidence showed that unlike Sacks, neither Martin nor Karken fully performed the contemplated services. We do not find *Sacks*, where the total price of an open-ended hourly fee agreement was dependent only on the number of hours ultimately required and where the plaintiff fully performed, controlling on these facts.

19

negotiations that never occurred, agreement lacked essential term and failed for indefiniteness as matter of law); *Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 134 (Tex. App.—Waco 2005, pet. denied) (provisions requiring future negotiation on certain terms, including when and by what method "market value" was to be determined, suggested parties agreed only to make future contract); *COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 664–65 (Tex. App.—Dallas 2004, pet. denied) (franchise agreement that failed to state minimum required sales volume—which set price and payment terms and which was to be determined by parties—lacked essential term and was unenforceable as matter of law); *DKH Homes, LP v. Kilgo*, No. 03-10-00656-CV, 2011 Tex. App. LEXIS 3655, at *8–10 (Tex. App.—Austin May 11, 2011, no pet.) (mem. op.) (agreement for construction of home that did not include size or price of house or time for completion lacked essential terms and was merely unenforceable agreement to agree). We overrule Martin's and Karken's fifth issue as to their contract claims.[6]

Also in their fifth issue, Martin and Karken challenge the factual sufficiency of the evidence supporting the jury's negative finding on their claim against Porter and LACM for tortious interference with his contract to perform services on the project. To prove tortious interference with an existing contract, a plaintiff must first establish the existence of a valid and enforceable contract subject to interference. *Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 456 (Tex. 1998) (per curiam); *Khan v. GBAK Props., Inc.*, 371 S.W.3d 347, 358 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

---

[6] Because our determination that the Letter Agreement lacked essential terms is dispositive as to Martin's and Karken's contract claims, we do not reach their factual sufficiency arguments concerning those claims, including their contention that Robbins and Beitler were partners on the project, which we address in our discussion of issue six.

Having concluded that the Letter Agreement was an unenforceable agreement to agree as a matter of law, we further conclude that Martin's and Karken's claim for tortious interference with that agreement also fails as a matter of law. *See WTG Gas Processing, L.P. v. ConocoPhillips Co.*, 309 S.W.3d 635, 653 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) ("Because we have concluded there was no contract, we agree that, as a matter of law, [appellee] is not liable for tortious interference."); *Texas Oil Co. v. Tenneco Inc.*, 917 S.W.2d 826, 830–31 (Tex. App.—Houston [14th Dist.] 1994), *rev'd on other grounds sub nom. Morgan Stanley & Co. v. Texas Oil Co.*, 958 S.W.2d 178 (Tex. 1997) (holding that letter agreement lacking essential terms was agreement to agree and summary judgment on claim for tortious interference was proper); *Odem v. Deloitte & Touche, LLP*, No. 04-09-00747-CV, 2011 Tex. App. LEXIS 731, at *21–22 (Tex. App.—San Antonio Feb. 2, 2011, pet. denied) (mem. op.) (where defendant presented summary judgment

establishing absence of contract as matter of law, trial court did not err in granting summary judgment on claim for tortious interference with contract).[7] We overrule Martin's and Karken's fifth issue.

**Quantum Meruit**

In their sixth and final issue, Martin and Karken request, in the alternative to their request for a new trial on their other issues, that this Court render judgment reflecting the quantum meruit damages the jury awarded to Martin. The jury found that Martin had performed compensable work for "The D.J. Robbins Company and/or Barry Beitler" and awarded $74,600 in damages. Beitler argues, among other things, that whatever compensable work was done was performed by

---

[7] Martin and Karken rely on *Clements v. Withers*, 437 S.W.2d 818 (Tex. 1969) for their contention that unenforceability of a contract is no defense to an action for tortious interference with its performance. *Clements* involved a written commission agreement between a landowner and a real estate broker that lacked an adequate property description under the predecessor to the Texas Real Estate License Act (RELA) and violated the general statute of frauds. *Id.* at 820. Thus, unlike this case, there was an existing contract, but it was unenforceable for lack of statutory compliance. *Id.* As the Supreme Court explained in *Trammel Crow Co. No. 60 v. Harkinson*, 944 S.W.2d 631, 635 (Tex. 1997), there is a "subtle but critical . . . distinction" between a "technical deficiency in a writing" and the absence of a written contract.

In *Harkinson*, the Supreme Court held that because there was no written commission agreement, as required by RELA, the tortious interference claims were barred, instructing that *Clements* should be limited to its facts. *Id.* Here, where there was merely an agreement to agree, there was no contract on which to base a claim for tortious interference. *See WTG Gas Processing, L.P. v. ConocoPhillips Co.*, 309 S.W.3d 635, 652–53 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (distinguishing between contract that was unenforceable under statute of frauds and no contract in context of tortious interference claim); *Superior Phones, Ltd. v. Cherokee Commc'ns., Inc.*, 964 S.W.2d 325, 331 (Tex. App.—Corpus Christi 1998, pet. denied) (holding that *Clements* reasoning does not apply where there is no contract). *Clements* does not inform our decision here.

Martin at the behest of Robbins for Robbins Company, not at the request of or for Beitler and that any assessment of quantum meruit damages should therefore not be against Beitler.[8]

The elements of a quantum meruit claim include proof that:

> 1) valuable services were rendered or materials furnished; 2) for the person sought to be charged; 3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him; 4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged.

*Bashara v. Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex. 1985) (internal quotations omitted). To satisfy the second element, it is not enough that a plaintiff's efforts benefit the person from whom he seeks damages; they must have been undertaken "*for* the person sought to be charged." *Truly v. Austin*, 744 S.W.2d 934, 937 (Tex. 1988) (citing *Bashara*, 685 S.W.2d at 310). Thus, incidental benefits and advantages that may have flowed to Beitler do not justify an award of quantum meruit damages against him unless Martin's services were performed for him. *See id.*

The record reflects that Martin undertook the services he performed based on communications with Robbins and pursuant to the Letter Agreement between him, Karken, and Robbins Company. The testimony and evidence showed that Martin's contact concerning the project was Robbins, with Beitler only being copied on emails, and that Martin never spoke with Beitler on the phone and met him on only one occasion, on the day of the town hall meeting, when Robbins introduced Martin as the person "who [Robbins] wanted to be the general contractor on the project."

---

[8] As previously noted, Martin and Karken's claims against Robbins Company were severed prior to trial.

In short, Martin had virtually no direct communication with Beitler concerning the services he provided for the project. Thus, whether Martin undertook the services for Beitler hinges on whether Beitler and Robbins were partners on the project, as Martin and Karken allege. *See* Tex. Bus. Orgs. Code § 152.304 (partners generally jointly and severally liable for all obligations of partnership).

The jury found that they were not partners, and Martin and Karken challenge the factual sufficiency of the evidence supporting that finding. When an appellant attacks the factual sufficiency of an adverse finding on an issue for which he had the burden of proof, he must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam). We consider and weigh all of the evidence and set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). We must not pass on the credibility of the witnesses or merely substitute our judgment for that of the trier of fact. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Pool*, 715 S.W.2d at 634.

We begin with the jury charge and instructions. *See Jackson*, 116 S.W.3d 757, 762 ("Before a court can properly conduct a factual sufficiency review, it must first have a clear understanding of the evidence that is pertinent to its inquiry. The starting point generally is the charge and instructions to the jury."). Question 3 asked:

Were The D.J. Robbins Company, Inc. and Barry Beitler partners in the August 31, 2007 Letter of Professional Engagement and/or the project known as Village Square?

Definition/instructions: A partnership is defined as "an association of two or more people or entities to carry on an undertaking or a business, as owners, for profit."

24

Factors indicating that people have created a partnership include· (1) receipt or right to receive a share of profits of the business; (2) expression of an intent to be partners in the business; (3) participation or right to participate in control of the business; (4) agreement to share or sharing: (a) losses of the business; or (b) liability for claims by third parties against the business; and ( 5) agreement to contribute or contributing money or property to the business. In determining whether a partnership exists, no single factor is decisive by itself and you should consider the evidence and what the parties said and did in light of the surrounding circumstances. You may not consider the parties' unexpressed thoughts or intentions.

Under Texas law, a partnership is defined as "an association of two or more persons to carry on a business for profit as owners . . . regardless of whether (1) the persons intend to create a partnership; or (2) the association is called a 'partnership,' 'joint venture,' or other name." *See* Tex. Bus. Orgs. Code § 152.051(b). The Texas Revised Partnership Act (TRPA) sets out the factors indicating a partnership:

(1) receipt or right to receive a share of profits of the business;

(2) expression of an intent to be partners in the business;

(3) participation or right to participate in the control of the business;

(4) agreement to share or sharing:

(A) losses of the business or

(B) liabilities for claims by third parties against the business; and

(5) agreement to contribute or contributing money or property to the business.

*Id.* § 152.052(a). In evaluating the existence of a partnership, direct proof of the parties' intent to form a partnership is not required, nor is proof of all of the statutory factors. *Ingram v. Deere*, 288 S.W.3d 886, 895 (Tex. 2009). Instead, the question of whether a partnership exists should be

25

decided after consideration of all the evidence bearing on the TRPA partnership factors. *Id.* at 895–96 (adopting totality-of-circumstances test). One person holding another out as a partner is evidence of an expression of intent that they are partners, as are statements that they are partners. *Id.* at 900.

Martin testified that Robbins held Beitler out as his partner in writing and at the town hall meeting at which Beitler was present. The evidence showed that Beitler and Robbins were members in a limited liability company that expended money for the project and that Robbins used an email address using Beitler's domain. In addition, the mayor of Horseshoe Bay testified that it was his impression that Beitler and Robbins were partners, and the city's proposed planned development ordinance referred to Beitler and Robbins as the project developers.

However, the mayor also testified that he never had any discussion with Beitler concerning whether he was Robbins's partner on this particular project, and Beitler testified unequivocally that he was not. He stated that at the time of the town hall meeting he and Robbins were partners on another project, pursuant to a written partnership agreement, but never had a partnership on this project. He also stated that it was "absolutely" his practice to have a written agreement for partnerships or limited liability companies and that he had never done a business deal with a partner without a written agreement. Beitler testified that he initially paid little attention to the project because Robbins was the developer and he planned to partner with Robbins later only if Robbins put together a deal he could invest in with less risk and if Robbins contributed money, neither of which occurred.

On the record before us, we cannot conclude that the jury's finding that Beitler and Robbins were not partners is against the great weight and preponderance of the evidence. Although there was evidence that Robbins held out Beitler as his partner and stated that Beitler had a "big vote" in decisions, Beitler's clear and direct testimony on that issue contradicted evidence of Robbins's claims. The jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony, and its first-hand assessments of Beitler's and Martin's credibility rationally could have informed its view of their testimony and the evidence. *See City of Keller*, 168 S.W.3d at 819; *Jackson*, 116 S.W.3d at 761; *Turner v. KTRK Television Inc.*, 38 S.W.3d 103, 120 (Tex. 2000) ("Because the trier of fact has the ability to examine the witness's demeanor, we must defer to its credibility determinations."). The jury could have reasonably believed Beitler's testimony and disbelieved the evidence of Robbins's partnership claims. As such, we will not disturb the jury's finding. *See City of Keller*, 168 S.W.3d at 819; *Durban v. Guajardo*, 79 S.W.3d 198, 208 (Tex. App.—Dallas 2002, no pet.).

Moreover, there was no evidence of any agreement that Beitler would share in any profits or losses. While there was evidence that Beitler contributed money, he testified that he did so only to advance the project in the hopes of getting it to a point where it was viable for him to partner with Robbins and fully participate. In light of the totality of circumstances, we conclude that the evidence was not so contrary to the jury's finding that Beitler and Robbins were not partners as to be clearly wrong and unjust. *See Ellis*, 971 S.W.2d at 407; *Ingram*, 288 S.W.3d at 895–96; *Lentz Eng'g, L.C. v. Brown*, No. 14-10-00610-CV, 2011 Tex. App. LEXIS 7723, at *16–17 (Tex. App.—Houston [14th Dist.] Sept. 27, 2011, no pet.) (mem. op.) (holding, under totality of

circumstances, evidence of two factors, splitting profits and participating in control, did not make finding of no partnership so against great and preponderance of evidence as to be clearly wrong and unjust). We conclude that the evidence was factually sufficient to support the jury's finding that Beitler and Robbins were not partners. Accordingly, we further conclude that Martin is not entitled to quantum meruit damages against Beitler. *See Truly*, 744 S.W.2d at 937; *Lentz Eng'g*, 2011 Tex. App. LEXIS 7723, at *16–17 (where evidence supporting finding of no partnership was factually sufficient, alleged partner was not personally liable to plaintiff for quantum meruit damages). We overrule Martin's and Karken's sixth issue.

## CONCLUSION

Having concluded that there is no evidence of damage to Porter's reputation, Porter's mental anguish, or Porter's lost profits and no evidence of Beitler's expenses for redesign, we reverse the trial court's judgment on Porter's counterclaim for defamation and Porter's and Beitler's counterclaims for tortious interference with business relationships and render judgment that they take nothing on their counterclaims. We affirm the trial court's judgment in all other respects.

_____

Melissa Goodwin, Justice

Before Chief Justice Rose, Justices Goodwin and Field

Affirmed in Part; Reversed and Rendered in Part

Filed: July 7, 2015

28